Realty Operators, Inc. v. Commissioner.
Realty Operators, Inc. v. Commissioner
Docket No. 423 PT.
United States Tax Court
1944 Tax Ct. Memo LEXIS 225; 3 T.C.M. (CCH) 520; T.C.M. (RIA) 44203; May 31, 1944
*225 Carl J. Batter, Esq., for the petitioner. R. E. Maiden, Esq., and Sidney Gambill, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This proceeding arises on a claim for refund of $241,791.81 paid by the petitioner from June 8, 1934 to October 31, 1935, inclusive, as a tax on the processing of sugar cane under the unconstitutional Agricultural Adjustment Act. The only question is whether the petitioner is entitled to any refund of the tax, and if so, in what amount? This is to be determined under the statutory conditions set out in section 902, Revenue Act of 1936, as amended by section 510 (e). Revenue Act of 1942. The facts, which were stipulated in part, are as follows: Findings of Fact Petitioner is a Louisiana corporation, organized on April 4, 1930, with its principal office at 500 Marine Building, New Orleans. Petitioner has always been engaged in the growing of sugar cane on 16 plantations, the renting of 36 plantations to tenants who grow sugar cane for the petitioner, the manufacture of raw sugar from its own grown cane and from cane purchased from other growers and tenants, the refining of raw sugar, making refined sugar without first converting *226 the cane to a raw sugar state, and the selling of raw sugar, refined sugar and blackstrap molasses. All the refined sugar and raw sugar produced by the petitioner during the pertinent periods was produced from sugar cane either grown by the petitioner or purchased from others. Petitioner was a "processor" within the intent and meaning of the unconstitutional Agricultural Adjustment Act of 1933, as amended, with respect to the first domestic processing of sugar cane. Petitioner filed monthly returns of processing tax under the Agricultural Adjustment Act and paid the total sum of $241,791.81 as processing taxes on the making of sugar cane into refined sugar. Petitioner filed a timely claim for refund of the $241,791.81 paid by it as processing tax. The claim was filed pursuant to Title VII of the Revenue Act of 1936, and was on the form prescribed by the Commissioner of Internal Revenue, P. T. Form 79. The Commissioner of Internal Revenue, by registered letter to the petitioner dated February 24, 1942, disallowed in full the petitioner's claim for refund. Petitioner's statutory "tax period", as defined in Title VII of the Revenue Act of 1936, was the period commencing June 8, 1934, *227 and ending October 31, 1935. Petitioner's statutory "period before and after the tax", as defined in Title VII of the Revenue Act of 1936, was the twenty-four months immediately preceding June 8, 1934, towit, June 8, 1932, through June 7, 1934, and the six months February to July, inclusive, 1936. The "period before and after the tax" is sometimes hereinafter referred to as the "base period". Sugar cane is not a one-year crop. The planting yields crops in three or four successive years. Planting takes place in the fual and the harvest commences around October of the next year. The first cutting is termed "plant cane" and cuttings in subsequent years are called "stubble cane". The 1932 crop, harvest of which began in October 1932, which is involved, because of the time of its planting, in the statutory base period, was planted as follows: 1931
36.52%
1930
29.75%
1929
23.58%
1928
10.15%
Total
100.00% The 1933 crop, harvest of which began in October 1933, which likewise is involved in the statutory base period, was planted as follows: 1932
34.42%
1931
42.64%
1930
20.03%
1929
3.09%
Total
100.00% The 1934 crop, harvest of which began in October 1934, which *228 also is involved in the statutory tax period, was planted as follows: 1933
44.62%
1932
31.02%
1931
23.15%
1930
01.21%
Total
100.00% The 1935 crop, harvest of which began in October 1935, which is involved both in the statutory tax period and the statutory period after the tax, was planted as follows: 1934
47.62%
1933
40.17%
1932
11.14%
1931
1.07%
Total
100.00%
The 1934 crop was the first one processed after sugar cane became a basic agricultural commodity under the Agricultural Adjustment Act, as amended. Around 75 percent of the expenses incident to any year's crop are incurred by June 1 of the year. Of the 1935 crop of sugar cane only that part which was processed in October 1935 fell within the statutory tax period and was tax-paid. The balance of the crop was processed during the months of November and December 1935, January 1936, and the statutory period after the tax. The amount of this year's crop processed in the tax period was 8,367,168 pounds of 96 degree raw sugar; and for the period after the tax, 12,439,096 pounds. The petitioner operated during the pertinent periods three factories in the sugar cane growing region of Louisiana, one in Houma, *229 known as the Southdown Factory; one at Greenwood, known as the Greenwood Factory; and one at Armant, known as the Armant Factory. The company operated these factories for only a short time each year, beginning with the grinding season which starts in October of each year and ends in January of the following year. Some refining was done at the Southdown factory after the close of the regular grinding season for its crop year 1934, that is, during May and June 1935; and also for the 1935 crop during the month of May 1936. During the remainder of the year the factories remained idle, undergoing repairs. The making of raw sugar and refined sugar ("direct consumption" sugar) from sugar cane is in fact a continuous process, whatever method is used, although the process may be interrupted at the point at which raw sugar is produced. In the refining of its sugar cane, the petitioner produced, in addition to raw sugar and refined sugar, a by-product known as blackstrap molasses. In two of its factories petitioner produced refined sugar from raw by the sulphitation process, by bleaching the judice with sulphur; and blackstrap. In the Southdown it uses the vegetable carbon process, which produces *230 refined sugar and leaves a by-product of blackstrap. In 1932, 1933, 1934 and 1935, the following acres of petitioner's farm lands were cultivated in "plant cane" and "stubble cane": Plant Cane
Stubble Cane
1932
3,101.56
5,392.02
1933
2,645.11
5,038.56
1934
3,554.75
4,441.11
1935
4,013.22
4,415.14
The costs of "plant cane" harvested by the petitioner in any year, such as for seed planting and cultivation, are greater than the costs of "stubble cane" for the same year. The petitioner's marketing territory is limited to the Mississippi Valley and is controlled by the freight rates. The points at which the freight rates begin to invade the normal profits are on the east Cincinnati, Ohio; on the north Minnesota; and on the west Texas, eastern half of Oklahoma and Kansas, Iowa and part of Nebraska; since these points in each direction competitors from other territories can reach at the same freight rate. These natural territories are encroached upon only to the extent that a refiner, such as petitioner, may be willing to reduce his profit by paying the additional freight. The petitioner used in the making of sugar during each year of the periods under review *231 from 8 to 8 1/2 percent of the Louisiana crop of sugar cane. Within its own territory there was the competition of the balance of the Louisiana crop and such off-shore sugars as entered the Port of New Orleans. The petitioner's sugars were marked within a period from late October to the end of the succeeding February in the following percentages: 1932
72.62%
1933
93.22%
1934
73.82%
1935
81.07%
The petitioner bought sugar cane from other growers in the vicinity of its factories. The ratio of purchased cane to cane grown on petitioner's own plantations was about 50 percent (within a fraction of one percent) in each of the years 1932 to 1936, inclusive. The cane purchased by the petitioner was bought on the basis of the average market price for the season from October to February, a period of approximately four months; although a small amount was purchased at the prevailing market price at the time of processing. In its departmentalized systems of accounts the petitioner charged its factories for cane from its own plantations at the current market price at time of processing for sugar cane of like grade and quality in the market where petitioner customarily bought its *232 purchased cane. The cost of the cane purchased by petitioner (which was bought at market value) plus the market value of the petitioner's own-grown cane for the statutory period before and after the tax was $2,339,171.46 and $949,841.17 for the statutory tax period. The petitioner received benefit payments from the United States under the provisions of its Sugar Cane Production Adjustment Contracts entered into between petitioner and the Secretary of Agriculture pursuant to the provisions of the Agricultural Adjustment Act, as amended, in the following amounts: Payments
Payments
Payments
Received
Received
Received
Contract Section
Base Period
Tax Period
Total
15(b)
$130,338.94
$130,338.94
15(c)
127,989.13
127,989.13
16(a)
$18,264.60
11,845.70
30,110.30
16(b)
5,351.92
3,471.04
8,822.96
$23,616.52
$273,644.81
$297,261.33
The petitioner made no refunds of processing taxes to any of its vendees on sugar sold or delivered prior to January 6, 1936. There is no agreement or understanding, written or oral, whereby the petitioner, or anyone whom petitioner directly or indirectly controls, or anyone by whom petitioner is directly or indirectly *233 controlled, may be relieved of, or reimbursed for, or may shift, the burden of the tax. No payments were made by the Secretary of Agriculture to any grower of sugar cane under section 8, paragraph 7, of the Agricultural Adjustment Act, as amended. Petitioner's books reflect the amounts expended by the petitioner during the two statutory periods with respect to its farm operations. These amounts cover such items as preparing land, seed cane, planting, hoeing, cultivating, fertilizer, wages of overseers and field-hands, garden and yard expense, drainage and ditching, roads and bridges, repairs to buildings, repairs to tools and equipment, repairs to tractors and trucks, gas and oils, stable expenses, feed purchased, compensation, fire and tornado insurance, taxes on farm lands, cutting and hauling cane, depreciation, a proportionate part of general and administration expenses, expense of raising corn and legumes which are plowed under to enrich the soil or used for feed for stock, and fuel for plantation hands. The total expenditures for the foregoing items without giving any effect to amounts received by petitioner as crop benefit payments under its Sugar Cane Production Adjustment *234 Contracts entered into pursuant to the provisions of the Agricultural Adjustment Act, as amended, added to the actual amount paid by the petitioner for cane purchased from others, amounted to the following sums for the statutory tax period and the statutory period before and after the tax: For the statutory period
two years before the tax
$1,925,800.27
For the statutory period
six months after the tax
275,979.04
For the statutory base pe-
riod
$2,201,779.31
For the statutory tax pe-
riod
$1,042,959.96
In a protest dated August 8, 1940, and then sworn to by W. Cameron Byrne, vice-president of the petitioner, and C. J. Batter, petitioner's counsel of record, which was filed with respondent before his disallowance of the claim for refund, the petitioner stated under oath that its accounting procedure with respect to the sugar cane processed was not based on actual cost but on the current market prices. The petitioner's statutory gross sale value of all articles processed by the petitioner from sugar cane during the statutory tax period was $2,116,053.12. The petitioner's statutory gross sale value of all articles processed from sugar cane during the statutory period before *235 and after the tax was $4,113,512.53. Schedules showing the details of caclulation of gross sales in both periods are incorporated by reference. The petitioner's statutory units of commodity processed for the statutory period before and after the tax and the tax period, expressed in terms of pounds of 96 degree raw sugar, were 105,634,588 for the period before and after the tax and 49,021,406 for the tax period. Schedules are incorporated by reference. The petitioner's statutory average margin by the unit pound of 96 degree raw sugar for the statutory tax period was $0.01885748 and for the statutory period before and after the tax was $0.01679671 by the unit pounds of 96 degree raw sugar, provided cost be based on the market value of petitioner's own home-grown cane, as contended for by respondent. The petitioner's statutory average margin by the unit pound of 96 degree raw sugar for the statutory tax period was $0.00206077 in excess of its statutory average margin (by the unit pounds of 96 degree raw sugar) for the statutory period before and after the tax; if the same basis of cost is used. But if the actual cost be used, as contended for by petitioner, the average margin for *236 the base period would be $.018098; for the tax period, $.016958; and the average margin for the tax period lower by $.001140 than for the base period. On June 8, 1934, the effective date of the tax on the processing of sugar, the price of refined sugar was increased by the claimant and the entire sugar industry by 55 cents for every one hundred pounds. The tax was at the rate of $0.535 by the hundred pounds of refined sugar. A 2 percent discount was allowed on all sales, making a net price increase of $0.539 by the 100 pounds. At this time, petitioner had no sugar on hand, the 1933 crop having been sold, and the 1934 crop not yet ready for harvest. The petitioner's cost of production, i.e., its cost of manufacturing the articles produced from the commodity processed, by the unit pounds of 96 degree raw sugar, was greater in the tax period than in the period before and after the tax by $0.000553 per unit. Its increased selling expense was $.00054; and its depreciation and general expense was $.002794; with a resulting total increase of cost of $.003887. Schedules showing details are incorporated by reference. The petitioner paid the following scale of wages per diem in its agricultural *237 operations for the 1933-34-35 crops: Planting, Cultivating, etc.
1935
1934
1933
Men
$ .90
$ .80
$ .80
Women
.60
.60
.60
Harvesting
Men
1.25
1.25
1.15
Women
1.00
1.00
.90
The period from the end of October to the end of the next February is that of seasonal depression, of falling demand and prices. The prices during this period for the several crop years are as follows for refined sugar: End of
Intervening
Succeeding
Decline
Crop Year
October
High
Low
February 28
Gross
Net
1932
$4.25
$4.25
$3.90
$3.90
$0.35
$0.35
1933
4.60
4.60
4.30
4.50
.30
.10
1934
4.65
4.65
4.25
4.30
.40
.35
1935
5.30
5.30
4.65
4.65
.65
.65
Such part of the petitioner's refined sugar as was produced by the vegetable carbon process at all times sold at a standard discount of 10 to 15 cents under the current standard prices of bone char refined sugar; and such part of the petitioner's refined sugar as was made by the sulphitation process sold at a standard discount of 25 to 40 cents below the standard current prices of bone char refined sugar. Schedules showing prices from June 8, 1932 to May 18, 1937 are incorporated *238 here by reference. The current market price of cane is based on the current market price of raw sugar, that is to say, if the price of raw sugar increased or decreased, the price of cane increased or decreased accordingly in a fixed ratio. For example, if raw sugar were currently sold for $2.00 a hundred pounds, then the current price of cane would be $2.00 a ton. During the entire periods under review sugar was quite generally sold by all refiners on the four-payment plan with guarantee against price decline. Under this arrangement, sugar is booked at the prevailing price at time of booking for shipment within thirty days and payment of one-quarter on the 10th day after arrival, one-fourth on the 17th day after arrival, one-fourth on the 24th day after arrival and one-fourth on the 31st day of arrival. Any price decline that takes place prior to the respective payment dates, reduces the price of the unpaidfor sugar to the extent of the decline. The price of refined sugar on June 8, 1932 was $3.70 per hundred pounds, rose later in the year to $4.25 and closed at $4.15. It declined to $3.90 in January and February, 1933, but began to rise in March, and was $4.70 on July 13, 1933, *239 a price maintained in September. The prices of raw sugar per pound in this period on the first day of each month were as follows: June 1, 1932
$0.0257
July 1, 1932
0.0280
Aug. 1, 1932
0.0307
Sept. 1, 1932
0.0318
Oct. 1, 1932
0.0316
Nov. 1, 1932
0.0304
Dec. 1, 1932
0.0287
Jan. 1, 1933
0.0275
Feb. 1, 1933
0.0266
Mar. 1, 1933
0.0285
Apr. 1, 1933
0.0295
May 1, 1933
0.0330
June 1, 1933
0.0330
July 1, 1933
0.0330
The rise in price from March to July 1933 took place while efforts were being made under government auspices to stabilize sugar available for consumption by voluntary quota restrictions which were tentatively agreed on in September 1933 but were rejected by the Secretary of Agriculture in October. On September 21, 1933 prices began a decline from $4.70 until a price of $4.30 for refined sugar was reached on December 19, 1933, which continued until February 10, 1934. On the next day it rose to $4.50 which held until April 17. The price of raw sugar declined at the same time from $.0362 per pound to $.0319 on December 19, and to $.0315 on December 31, 1933, but rose again to $.0342 on February 10, 1934. This decline in refined sugar which followed the collapse *240 of stabilization negotiations, was the result of the usual seasonal decline of prices and of the release of sugar held back from the market while the negotiations were in progress. On February 8, 1934 the President sent a message to Congress (73rd Congress, House Document No. 246), the pertinent parts of which are as follows: "I do not at this time recommend placing sugar on the free list. I feel that we ought first to try out a system of quotas with the three-fold object of keeping down the price of sugar to consumers, of providing for the retention of beet and cane farming within our continental limits, and also to provide against further expansion of thisnnecessarily expensive industry. * * * * *
"This situation clearly calls for remedial action. I believe that we can increase the returns to our own farmers, contribute to the economic rehabilitation of Cuba, provide adequate quotas for the Philippines, Hawaii, Puerto Rico, and the Virgin Islands, and at the same time prevent higher prices to our own consumers. * * * * *
"The objective may be attained most readily through amendment of existing legislation. The Agricultural Adjustment Act should be amended to make sugar beets *241 and sugar cane basic agricultural commodities. It then will be possible to collect a processing tax on sugar, the proceeds of which will be used to compensate farmers for holding their production to the quota level. A tax of less than one-half cent per pound would provide sufficient funds. "* * * In order to make certain that American consumers shall not bear an increased price due to this tax, Congress should provide that the rate of the processing tax shall in no event exceed the amount by which the tariff on sugar is reduced below the present rate of import duty. "By further amendment to the Agricultural Adjustment Act, the Secretary of Agriculture should be given authority to license refiners, importers, and handlers to buy and sell sugar from the various producing areas only in the proportion which recent marketings of such areas bear to total United States consumption. * * * * *
"The application of such quotas would immediately adjust market supplies to consumption, and would provide a basis for reduction of production to the needs of the United States market." An advance in the price was brought about by the above message. Prices of refined sugar on April 18, 1934 again *242 declined and reached $4.10 on May 23, where it remained until the effective date of the tax, June 8, 1934. This decline in refined sugar was caused by the anxiety of the refiners to get rid of sugar on hand before the new "floor tax" of the Agricultural Adjustment Act went into effect; retailers being allowed thereunder a 30-day stock of sugar free from tax, section 16 (b). The price of raw sugar declined from $.0342 on February 10, 1934 to $.032 on March 10, to $.0272 on April 10, rose to $.0285 on May 10 and was $.028 on June 8. On June 8, 1934, when the provisions of the Agricultural Adjustment Act went into effect and the increase of price was made by the sugar industry, the price of refined sugar rose from $4.10 to $4.65 per hundred pounds. The price rose to $4.75 on October 1, but fell by December 21 to $4.30, the same price it had brought on that day in 1933. Raw sugar went up from $.028 on June 8, 1934 to $.0335 on August 30, dropped to $.0286 in September and remained steady through December at $.02975. A comparison of prices of refined sugar during the period from the end of October to the end of the succeeding February at half-monthly intervals shows: Crop Year
1932
1933
1934
1935
1936
October 31
$4.25
$4.60
$4.65
$5.30
$4.50
November 16
4.25
4.50
4.50
5.10
4.80
December 1
4.15
4.50
4.50
5.10
4.80
December 16
4.15
4.40
4.40
4.90
4.80
January 1
4.15
4.30
4.30
5.00
4.80
January 16
3.95
4.30
4.30
4.75
5.00
February 1
3.90
4.30
4.30
4.65
5.00
February 16
3.90
4.50
4.30
4.65
5.00
February 28
3.90
4.50
4.30
4.65
5.00
*243 On February 11, 1935, the price advanced to $4.25 but remained there only one day, returning to $4.30 on February 12, 1935. This price level continued until March 24, 1935. On March 25, 1935, the price advanced to $4.50; on the 27th to $4.70; on the 29th to $4.90; on April 23rd to $5.10; and on April 29th to $5.25. This price was maintained until July 17, 1935. The Secretary of Agriculture had reduced the quota for the year 1935 by over 100,000 tons and the advance during March and April of ninety-five cents was due to the nervousness created by reduced quotas. The price of raw sugar rose from $.02975 on January 1, 1935 to $.0335 on April 24, fluctuating around this figure for 2 months and then declining from June 19 to a low of $.0316 on August 6. It rose to $.0343 on August 20, got up to $.0365 on October 1 and ended at $.0340 on December 31, 1935. The price of $5.30 for refined sugar continued to November 26, 1935, and then declined in three steps to $4.90. Except for one slight interruption the price of $4.90 continued until December 31, 1935. This seasonal decline - except for a slight interruption lasting five days in January 1936 - continued until March 3, 1936, when the *244 price reached $4.55, where it rested for two days and advanced in four steps to $5.00 by the end of March 1936. The price of $5.00 was maintained until July 9, 1936. On July 10, 1936, prices declined to $4.75 and fluctuated between that price and $4.59 until November 11, 1936, when prices returned to $4.80. The price of $4.80 continued until January 5, 1937, when it was $5.00, returning to $4.80 on March 1, 1937, and holding at that figure until May 19, 1937. During the statutory period of 6 months after the tax the quota restriction continued. During the period "before and after the tax" the petitioner's manufacturing, sales and administrative expenses amounted to $1,840,892.97, or $.017427 by the pound of 96 degree sugar raw value; and during the "tax period" to $1,044,820.50, or $.021314 by the pound of 96 degree sugar raw value. The petitioner's increased costs of manufacturing, selling and administration during the "tax period" amounted to $190,546.21; or to $.003887 the pound of sugar, 96 degree raw value. The petitioner's grinding season terminated late in January or early in February. Afterseason refining operations were conducted in May and June 1935, and in May 1936. *245 In no other year under review were any refining operations conducted excepting during the grinding season. The after-season refining resulted in the production of refined sugar from raw sugar. and after the tax was $.043534 the gallon; for the tax period $.064049; and for the period nineteen months after the tax $.064261. The type of product derived from the commodity processed during the "tax period" was of a higher quality than during the period "before and after the tax". The percentage of each to the total is: Before and
Tax
Product
after tax
period
White Sugar
74.773
86.516
Sulphitated Sugar
18.467
13.484
Raw Sugar
5.494
none
Second Sugar
1.266
none
The above products appear in the gross sale value of the margin computation for the period "before and after the tax" in the amount of $403,109.56. For the period "before and after the tax" sulphitated sugar was included in gross sale value at prices that averaged $.003357 per pound, 96 degree raw value, less than the price at which the white, or vegetable carbon, sugar was included. For the "tax period" sulphitated sugar was included in gross sale value at prices that averaged $.00978 per pound, 96 degree *246 raw value, less than the price at which the white, or vegetable carbon, sugar was included. The control of supply and demand by means of the quota system made it possible for the sugar industry to make some increase in the price of sugar on and after June 8, 1934. During the period two years before the tax the quota system was not in effect. During the period six months after the tax the quota system continued in effect although there was no processing tax. Opinion KERN, Judge: We are here concerned with the claimed refund of processing taxes paid under the Agricultural Adjustment Act, as amended, which was held unconstitutional by the Supreme Court on January 6, 1936. . The refund is hedged about by various provisions enacted by the Revenue Act of 1936, sections 902, 907, as amended by the Revenue Act of 1942, section 510 (e); so as to prevent unjust enrichment of the taxpayer who may have passed on the tax to the consumer or middleman. Section 902 provides that "no refund shall be made or allowed * * * unless the claimant establishes * * * that he bore the burden of such amount and has not been relieved thereof *247 nor reimbursed, nor shifted such burden, directly or indirectly, (1) through the inclusion of such amount by the claimant * * * in the price of any article with respect to which a tax was imposed * * *." Section 907 deals with prima facie evidence and presumptions which shall be available in determining the questions of ultimate fact posed by section 902. If we consider the instant case without resort to statutory presumptions in order to determine whether petitioner bore the burden of the tax or passed it on to its vendee, the one inescapable fact which stands out in the complicated record before us is that petitioner, along with the entire sugar industry, increased the price of sugar in the amount of the tax on the very day when the tax went into effect and the price was not reduced at any later time by the amount of the tax or for the purpose of subtracting the tax from the sales price. We should therefore conclude, without recourse to presumptions, that petitioner shifted the burden of the tax imposed through inclusion of the amounts in the price of sugar. If, in a consideration of the question, we turn for assistance to the presumptions set out in section 907, and resolve *248 all of the controversies raised by the parties with regard to the "margin" during the tax period in favor of the petitioner, we should reach the same result. Assuming, without deciding, that the cost of petitioner's own-grown cane should be ascertained under section 907 (b) (5) (A) and not under section 907 (b) (5) (B), and that the benefit payments received by petitioner should not be deducted from its costs, it would result that the "margin" during the tax period would be lower than the "margin" during the period before and after the tax. However, any presumption in petitioner's favor raised by such a lower "margin" under section 907 (a) is overcome, under section 907 (L) (2) by "the proof that the claimant * * * changed the sale price of the article * * * by substantially the amount of the tax * * *." The claimant, in turn, under this same section, may establish that this change was caused by factors other than the processing tax. These factors, section 907 (e) (1), are changes "(A) in the type or grade of article or commodity, or (B) in costs of production." While the record shows that changes occurred during the tax period in the type of commodity produced by petitioner and in *249 the cost of production, there is no proof that these changes occurred at the time of the price increase or were reasonably to be anticipated at that time, or in any way caused the price increase which occurred at the time when the tax went into effect and in substantially the amount of the tax. Therefore, any presumption which might be raised in petitioner's favor by a lower "margin" during the tax period has been rebutted by respondent's affirmative proof. Petitioner contends vigorously that the increase of price made by the sugar industry on June 8, 1934, was caused by the system of quota-controls which became effective as of that date, and that the quota system must be considered as a "factor" under section 907 (e) (2). It may well be that the quotas placed upon the importation of sugar made it possible for the price increase to be made, but the fact that the price increase was made not only on the date when the tax went into effect, but also in the approximate amount of the tax, indicates clearly that the petitioner was shifting the burden of the tax by the increase in price. The existence of the quota system was a circumstance which made some price increase possible but it *250 was not a "factor" within the meaning of the statute which would make the price increase necessary, such as a change in the type of commodity produced or a change in the cost of production. Since our decision is in favor of respondent, even if we resort to statutory presumptions and assume in petitioner's favor that its margin for the tax period was lower than for the period before and after the tax, it has not been necessary to make a definite finding with regard to the petitioner's "margin" during the tax period as defined by section 907, and it is therefore unnecessary to determine whether the cost of petitioner's own-grown cane should be ascertained under section 907 (b) (5) (A), or section 907 (b) (5) (B), or whether the benefit payments received by petitioner under the Agricultural Adjustment Act should be deducted from its cost. Decision will be entered for the respondent.